Churches and Houses of Worship, the essential core of that is worship and prayer and Bible study. That makes it different than the others, and yet they're put in a quandary where they can do part of it, but they can't do the rest of it because they run the risk of violating the no-worship order when they meet with drug abuse individuals, substance abuse individuals, individuals that they're helping from the social services standpoint. They're provide those just from a purely secular component, at least the churches that we represent won't. That's what their core mission is, but in addition to the internal, there's the external as well, and I'd like to point out a few things with regards to that. When you look at the comparisons there between the Supreme Court, this court's decision in the two decisions from the same panel in Nevada and the Second Circuit, and now even the most recent Sixth Circuit that came out regarding Christian schools, but aside from the Sixth Circuit, the following entities of secular non-worship activity were mentioned collectively in those three opinions, and all of those are permitted in this particular situation in California. Food packaging and processing, laundromats, warehouses, grocery stores, liquor stores, big box retail stores, malls, transportation facilities, bus stations, train stations, airports, and not necessarily casinos. The state has said they're regulated by some other rules, but retail businesses and garages, plant manufacturing, chemicals and microelectronics, transportation facilities, hardware stores, liquor stores, insurance agents, pet stores, big box stores I've already mentioned, and Hollywood production facilities and numerous other entities, accountants, and lawyers. Those are some of the comparisons that are inherent in Catholic diocese in Calvary Chapel from this Second Circuit's recent decision after the decision from the U.S. Supreme Court on Catholic diocese in the synagogue case as well, and those are inherent here as well, and those are permitted. Council, right there when you said that long list of activities that are permitted, forgive me for interrupting, but could you clarify, I think you're speaking of the activities in the blueprint, and I'm not sure if you're distinguishing between the activities in the blueprint and the activities that are essential, I think, essential infrastructure in the updated stay-at-home order, the December 3rd stay-at-home order, so could you clarify that please? Sure, the only real difference between the critical businesses, which most of those that I just discussed and listed are part of the critical businesses, like transportation and so forth, and part of the critical businesses, those are still under the blueprint or under the regional stay-at-home order on page 2 of that order, permitted to operate in the same manner. The only distinction, more restriction, is on paragraph 1F, retailers, and retailers operate indoors at no more than 20%. That's a difference from the blueprint. The blueprint has those in tier 1 operating at 25%, so it just dropped the retailers only by 5%, whereas in tier 1, places of worship can't meet at all, and yet retailers were the comparatives in all of those cases that I've mentioned, and that's the only real difference with regards to the critical businesses, all of which that would fall in tier 1. Well, Kelsey, may I ask? I'm sorry? No, go ahead, please. May I ask, your complaint challenges any future order that prohibits religious worship, is that correct? That's correct. Is the argument against the stay-at-home order any different than your argument against the tier 1 of the blueprint? No, it's really not, other than the fact that, in fact, it incorporates under paragraph 7, the blueprint of August 28, 2020. Well, actually, sir, the December 3rd order says very clearly that it supersedes the blueprint, and that it's in place unless or until the ICU capacity rises back up to 15%, so I agree with you about the 20% difference in the December 3rd order as to retail, but the very first provision in the December 3rd order says that all gatherings with members of other households are prohibited unless allowed. Right, but let me just make one correction, your honor. It's not a 20% difference, it's a 5%. The blueprint on retail... Yes, yes, yes, I agree. It's limited to drops to 20% in retail from 25 to 20, gotcha. Correct. But part A, the first thing that December 5th order does is say that all gatherings with members of other households are prohibited unless expressly permitted. Right. Categories in the blueprint that aren't expressly allowed in the December 5th order. Okay, well, but if you go on, your honor, to number D, critical infrastructure sectors may operate and must continue to modify operations pursuant to equitable sector standards. It goes on to say that guidance related to schools remain in effect and unchanged. Yes. And so as it relates to the essential businesses, this is talking about people of different households gathering together. And so that's the same thing as it's in the blueprint, which is banning the, what we have argued, the Bible study in a home with somebody who's not there. And that does the same exact thing that the blueprint does. But also the blueprint, I'm sorry, the regional stay-at-home order does not take away the essential businesses, does not take away the critical infrastructures. And much of what is listed that I just mentioned is part of the critical infrastructure. Well, the December 3rd order included an update of what is included as critical infrastructure. So let me just ask you, does your brief include an argument that the December 3rd order unfairly singles out houses of worship for harsh treatment? I absolutely agree that you've got the argument about the blueprint. I'm just trying to figure out if you've separately briefed the December 3rd order, sir. The argument is the same, Your Honor, that it does continue the discrimination that was inherent in the blueprint and was inherent even before the blueprint. I think the blueprint just made it more clear and the regional stay-at-home order continues that discriminatory treatment with regards to places of worship with minor modifications, but the essential court discriminatory treatment remains the same. Thank you. Counsel, do you discount the experts that were offered by the state? Your Honor, I don't discount experts per se, but the experts that were offered by the state do not really present expert testimony in the sense that they're just generic statements without any empirical evidence. And the Supreme Court was presented with experts as well, and the majority rejected them. The Ninth Circuit and the Second Circuit was presented with experts as well, and those were rejected as well because they just gave generic statements. For example, they make these statements. Harvest Rock Church is in the former Ambassador Auditorium. That is a classic venue for concerts, so much so that Pavarotti sang there. It is a place that the church has allowed the city of Pasadena to have concerts and other kinds of events. It's state-of-the-art, and yet the experts have this stereotypic statement that churches don't have good ventilation and they're older, and yet grocery stores have good ventilation and they're newer. That's not only stereotypical, but frankly, I think it borders on animus to make those kinds of broad statements. Well, I think they said some of the churches are old. They didn't say all of them are old. Well, I think, Your Honor, they have a generic statement to that effect, and it's not only wrong, but it's offensive and it's stereotypical, and that is not based upon any empirical evidence at all. In fact, we take significant health precautions, and not one episode in the many, many churches that we represent of outbreak has been found or noted by anyone, and we have no knowledge of it. So we're doing everything possible beyond what is done in many of these other venues that are allowed to operate with no restrictions or much less restrictions. Your Honor, I think I'm running into my rebuttal time, and if you don't mind, I would like to remind you of my time. Counsel, you're down to three. Oh, I'm sorry, Counsel. Your attention is back. You're down to three minutes and change. I just have one final question. When you said there was no outbreak, but isn't that because there haven't been any services? No, Your Honor. In fact, some of them are doing services. Harvest Rock is doing services under threat of criminal penalty by the prosecutor of Pasadena. And not only him, but everybody who comes to the church, even the congregate is under a criminal threat by the Pasadena City prosecutor and by the public health department and daily fines of a thousand dollars. But they are incorporating that particular health requirements and precautions into the worship service. Otherwise, they would have been cloned. Not everyone is open, but many of them are open under threat of criminal prosecution. Thank you. Can I just ask one related question, please? Can I ask one related question before we go? Sir, in Catholic diocese, my read is that the Supreme Court took exception to the numerical limits. There were very small numerical limits, as you know, because they were imposed in particular without regard to the size of the facility. Do we have any anything in the record about the size of the of Harvest Rocks? You know, just the buildings. I know I appreciate we're talking about more than one, but. Yes, we do. Harvest Rock, we put in our brief seats 1,250 people. So when you move into Tiers 2, Tiers 3, for example, gyms, 10% on gyms in Tier 2 and 25% in Tier 3. Let's just take gyms and others have higher percentages. No numerical cap, by the way, on a gym or fitness center. But in this, you not only have a 25%, no greater than 100 in Tier 2 or 50%, no greater than 200 in Tier 3. So take the 10% of gyms. That would be 125, not 100. Take the 25% that a gym or fitness center can do in Tier 3. That's 312 for Harvest Rock, not 200. And Harvest Rock is a small church in some of those cases. Some are larger, some are bigger. But when you look at those percentages and the numerical restrictions, it's very clear as you move through this Tier 1 through 4 that the discrimination is inherent, which no expert affidavit can fix. It has to be systemically changed. Thank you for that. Thank you, counsel. We will now hear from counsel for the state. You may proceed. Yes, good afternoon. Deputy Attorney General Todd Grabarsky on behalf of Governor Gavin Newsom. The court should deny the injunction. And I'd like to start just by explaining why we're here and how we got here to this point. About a week after the Supreme Court's Roman Catholic Diocese opinions, plaintiff in that case went to the Supreme Court and said, hey, you all just decided Roman Catholic. You joined part of New York's restrictions. Take that reasoning, apply it to California and join California's restrictions. The Supreme Court said no, denied that request, remanded to the district court for further factual development. That's exactly what we did. The state has presented a really robust record, much more robust than Nevada presented in the Calvary Chapel cases. And indeed, the state provided evidence and expert testimony explaining that California has adopted objective and neutral policies that are proportional to the specific risk, not just of worship services, but of all activities, religious and secular life. Counsel, I think you have presented a really impressive set of data. And I spent the New Year's weekend, as my colleagues did, boring through it. And it's very helpful. But I'll just tell you, I'm troubled by tier one, no religious services in tier one. And I'm troubled by the numerical caps imposed without regard to the size of the facility in tiers two and three. Could you speak to that, please? Yes, Your Honor. So we have to look at the comparators and the different activities to determine whether religious services are in fact being discriminated against. And just to go through some of the comparators, and the purpose of this is to determine whether rational basis is being applied. The Supreme Court's opinion from 1993 in Churchill, not over that opinion. If we decide that a strict scrutiny review, are all of your arguments out the window? No, Your Honor, not at all. As the district court found that, you know, even putting aside all those comparators, and even a strict scrutiny were to apply, that the restrictions are narrowly tailored. Let me ask, oh, I'm sorry. That's okay. Counsel, if that's the case, why should tier one be a total ban? When tier two allows a 25% capacity or 100 person limit? Why couldn't tier one be, let's say, 10% or 25 people with strict masking, 10 feet distance in the pews between people and no singing? Why does it have to be a total ban rather than some tighter restrictions? So, Your Honor, our experts have testified as to that reason. And they've testified that in regions and counties where the virus is widespread, and that's the tier one counties, or in regions where ICU capacity availability is less than 15%. And that's the regions covered by the stay-at-home order. Masking, distancing, other less restrictive measures are insufficient to curb the exceptionally high rate of large indoor gatherings. And this is doctor... Well, what about the difference, I think you heard from your opponents in counsel, between the size of the churches? There's a 1500 capacity apparently in Pasadena. I go to a church that is 160 people. It's a small church. Why should the rule be identical regardless of the size? That's what our experts have testified about, that indoor gatherings pose an especially high risk in areas where the virus and the disease is widespread, and hospitals aren't able to treat those who become ill. This is Dr. Watt's testimony, paragraphs 44, 46, and 100. Right, so the problem you've got, again, we've gone over the record really carefully, but the problem I think you've got, and I just want to give you every chance to discuss this, I think that was the record in New York and in Nevada. And essentially that the same general types of empirical data were before the court about the risk of transmission. And of course, clearly that's the concern here with these eight criteria that are applied. And yet the Supreme Court took a very strong exception to a numerical cap imposed without regard to the size of the facility. So what's your best shot on that, please? Your Honor, with respect to what the Supreme Court decided, the situation in New York is different. That there was evidence of animus, there was evidence of targeting, and frankly- Well, they set aside the evidence of the animus. Or the statements, right? They set aside the statements, and we don't have statements here, I don't think. Yes, Your Honor, I agree with that. But the state of the virus in early November was different than it is now in California, as it was in New York. Again, certainly in the Nevada case, there certainly was not the same expert testimony that we presented. The record was extremely thin in Nevada. And in New York, again, the record wasn't as robust as the record that we've had. We've had three experts testify that under no circumstances, all indoor gatherings can't take place in regions where the virus is so widespread as it is currently. And again, I appreciate that the panelists were spending much time looking for the record, and I think that's important because plaintiffs don't present any rebuttals at the testimony for that. So we're in a situation where our experts have testified. No matter the size, I understand the problem versus other hospitals, larger and smaller than others, but our experts have said, look, when you have the virus as widespread as it is, as raging as it is, where ICU availability is very low, particularly in Los Angeles County, but in California, even in our emergency rooms and turning rooms, any indoor gatherings just pose too great of a risk. And I think some additional insight for them. That's the expert testimony. Unfortunately, plaintiffs elected not to present their own testimony. So the obvious response is, there are obvious responses. It's not any indoor gathering. These are factors, right? They're not a checklist. So there are other facilities, if you want to use that word, where a lot of people go there each day, a grocery store, right, for example. And of course, that's critical infrastructure because people have to eat. And your experts have talked about, yes, but people tend to spend less time there. And those facilities tend to have more refrigeration. And so it's a balancing. It's not a straight apples to apples comparison. You know, I'll grant you that. But it's a very troubling that in, without regard to the size of the facility, that there would be zero indoor worship service allowed in tier one. Let me, given the ruling that we have, you know, the Nevada case and the New York case. Let me ask you this. I don't see for my part that there is briefing explaining the comparisons between the updated infrastructure list on December 3rd and what we have. I read the Harvest Rocks briefing to really attack the blueprint. And I have telegraphed that I am troubled by part of the blueprint. But it also seems to me that if we find part of the blueprint deficient, I should be very clear about this, that the current state of affairs is that the December 3rd order does not allow indoor worship services in four out of five regions in the short term. But if I'm wrong about that, I really want to know that I'm wrong about that. So could you clarify? No, you're correct. I'm sorry, what? You're right. OK, well, now you just said, no, you're correct. And you know, I'm sorry. The order in those regions do not permit indoor worship services. That's OK. But should our analysis of the indoor worship ban under tier one, which has been really the focus of this whole case, be the same as under the stay at home orders? It's the same analysis, is it not? Well, there's a few differences with the stay at home orders that demonstrate that the state is not, at least under the regional stay at home order, the state is not, you know, certainly the state's position is not targeting or singling out religious services under the blueprint, but that's more apparent under the regional stay at home order. Some of opposing councils' comparators, such as laundromats, are not permitted under the regional stay at home order. But the analytical approach, looking at it from the constitutional First Amendment religious clause point of view, is still the same. It's still a ban on indoor worship. Yes, your honor. Yes. OK. Right. But to figure out whether to figure out whether the December 3rd order singles out houses of worship for harsh treatment, we have to have a briefing making that an analytical comparison. I don't know that we have it here. I don't see it. That is my concern, to be really clear. Your honor, I share that concern from opposing councils' briefings. They didn't discuss the regional stay at home order. It didn't seem like they were challenging it in the same way that challenging if the court would like, you know, we would be happy. And issue supplemental briefings specifically about the regional stay at home order. But one thing I'll talk about about the regional stay at home order that's different from the constitutional layout is the balance of equity, which is a completely separate factor that plaintiffs have the burden of approving that's separate from the constitutional likelihood of success analysis. The context by which the regional stay at home order was issued was in this really massive, unprecedented surge of COVID infections, hospitalizations, and deaths. And so in joining the regional stay at home order, which is specifically designed to address that surge, would undoubtedly lead to even more infections, hospitalizations, and deaths. But counsel, I'm not sure that this factor cuts in your favor. And let me tell you why again, so you have a fair chance to respond. If we don't have, this is a hypothetical to be sure. But if there's a problem, a constitutional infirmity in the blueprint, but the state would have an opportunity to fix that, given the December 3rd order preventing indoor worship services in the meantime, then it seems to me that the balance of the hardship and the public's interest is less threatened in the short term. Because it's not the case that if we were to rule and note the constitutional infirmity in the blueprint, that all of a sudden, indoor worship service would happen. I understand your point, Your Honor. So if I may just respond to what I think Your Honor is asking, is that are you suggesting to enjoin the blueprint, but not the regional stay at home order? I am suggesting that the blueprint is what's briefed. That's what's briefed. And if I were to decide that I think there's a constitutional infirmity in the blueprint, but that we don't have a basis here to enjoin the December 3rd stay at home order, then it seems to me, getting back to your point under the winter factors, that the public's interest, which is great here, of course, you both have very serious interests at stake here. But there would not be, I think, I don't see why there would be a concern that there would be a huge surge in church attendance, because I don't think there could be given the December 3rd order. In other words, the state would have an opportunity to fix if we find there's a problem in the blueprint. I understand that, Your Honor. The regional stay at home order is only temporary. So it's going to go away. So it would be this great harm to the public and great harm to the state's interest in protecting by enjoining this. Counsel, I'm always very suspicious of temporary buildings, temporary orders. There's no indication that this is going to expire in another week or two. More likely, we're talking months, if not through the summer. Your Honor, I share your concern. You know, fortunately, vaccines have been approved and are being distributed, including in California, including in Los Angeles County. So there is some light at the end of the tunnel here. But here we're talking about the protection of a constitutional right, which is vested in the First Amendment. And you've already indicated that the analysis of the indoor worship band under Tier 1 should be the same as the analysis under the stay at home order. You've already indicated that to me in my earlier question. The analysis, it's similar. It's a similar analysis. But as Judge Christen had said... Well, there are different restrictions. But still, it comes back down to Brooklyn Diocese, doesn't it? In terms of what the controlling constitutional analytical issues are. Yes, Your Honor. Wait a minute. That's the analytical framework. This matters a lot. And you're saying it slightly differently. We don't have any briefing on whether the December 3rd order singles out houses of worship for harsh treatment. That's my take on this. If I'm missing it, I think we're getting two different answers from the state. And I need clarity on this, please. Yes, that is correct. We don't have briefing on the December 3rd order. So we don't have elucidation of how the facts of the Supreme Court apply to the facts as modified by the stay at home order. Yes. Yes, Your Honor. If you're asking me today, as Judge O'Scanlan, is the analysis similar? It's similar, but there are differences that should be briefed. Such as? It seems to me that this church has to ban or has to close its doors, at least to comply with the order. Either way, either because of the stay at home order or because of tier one in the blueprint. They're hurt either way. There are other activities that are affected by the regional stay at home order that are not affected in tier one blueprint, for example. So the narrow tailoring issue is more refined with, as I see it, with the stay at home order than with the blueprint. The narrow tailoring, yes, certainly, Your Honor. But also, even for rational basis, that it's more clearly that rational basis scrutiny would apply because a lot of the comparators that opposing counsel do aren't present in the regional stay at home order, such as laundromats, such as hair and nail salons, gatherings. You know, you could have a situation where four members of different families can't go and have a picnic outside in a park under the regional stay at home order. But hundreds of people can gather for worship services in that same park. So you just hit on a question that I had looking at the blueprint. And I know we're really grilling both of you, but you both have very important issues and we're really trying to get this right. So I appreciate your patience. One of the categories, sectors, I guess, in the blueprint that I don't see accepted in the regional stay at home order is nail salons and hair salons and whatnot. Are those gatherings of more than, is that under part A of the December 3rd order, gatherings? No, your honor. That's personal care services are not permitted under the December 3rd regional stay at home order. So the answer to my question that is yes, not no. That's what I was asking. I don't see them accepted under the December 3rd order. Is that yes, they are not accepted? Because the gatherings are prohibited unless they're accepted. And I don't see these accepted. Correct. Thank you. But big box stores are allowed, is that right? Yeah. Yes, your honor. Big box. What's allowed? Big box stores. Big, big box stores. So that's what, that's my problem. I don't understand why it makes any difference. I mean, any relevant difference, whether you look at the stay at home order or whether you look at the tier one blueprint. Your honor, as I had said, some of the comparators are. I mean, except for some comparators. And if one were to look at the comparators and see that the relevant comparators aren't any different between the two, then there isn't any difference, any relevant difference. Again, it's relevant to determining whether the state as, and this is the standard for Roman Catholic, it's relevant to determine whether the state is singling out worship for especially harsh treatment. And it's the state's position. The blueprint does not do that, but it's even more clear that under the regional stay at home order, the state does not. Well, is that quite right? I don't know. We're talking about animus here. It is less than equal treatment. That's the key. Is it not, not, not, you don't have to find animus. You have to find that there's discrimination regardless of whether it's animus or not. Not, not, not necessarily. The standard again is singling out for especially harsh treatment. And some of the comparators that plaintiff's counsel is bringing up are subject to a host of other restrictions that are not imposed on worship services. I think childcare is a good example that was discussing in plaintiff's counsel's presentation. Factories are really subject to pretty onerous tracing and contact tracing and isolation restrictions that are not applicable to houses. Are those the, do we find those in industry guidance? Is that where we look for those? Yes, your honor. Yes. Just, just one more question. When a, when a, when a house of worship operates in another capacity, such as providing child care or drug service or counseling, any of the other important things they do that are not of a religious nature, are they required to apply, sorry, comply with the, with the requirements for those sectors? Yes, your honor, they are. So it's not, it's not the case that a church can have a childcare service or a mass group counseling that is subject to no restrictions at all. If they could have people in their sanctuary, if I think that's the right term in their building anyway, providing those services subject to the other restrictions applicable to those services. Is that right? Yes, your honor. But those, those activities, as we've discussed in our brief are not comparable. They're not analogous to worship services. I understand. Counsel, I just have one final question for me. Could you briefly go through, in addition to the likelihood of success on the mirrors, could you go through the winter factors and say if each of those factors favors the state or the plaintiff and if, and why you make that representation? Yes, your honor. So the second winter, the next winter factor is irreparable harm. The district court here out there suggested that there might not be irreparable harm because plaintiffs can worship outside in unlimited numbers. The state, you know, not taking a position on that, it's the state's position that generally not being able to worship indoors does constitute some harm, but going into the, you know, the harm is greatly outweighed by the public interest. Yes. Yes, your honor. And that's especially true given as our experts have testified and plaintiffs have presented no rebuttal to this, that large indoor gatherings, such as worship services, such as concerts, such as lectures, pose an exceptionally high risk of COVID transmission, that masking, that distancing, that increased hygiene does not mitigate, especially in areas where the virus is so widespread as it is in LA, in Los Angeles and the rest of Southern California. That does go to narrow tailing, but it also goes to the ballot. And I'll just, a final point, I'll just note that the state has tried to let the district know that back in March, there was a regional state shutdown, you know, no one really could leave their homes, clergy were exempted to set up streaming services. In May, the state permitted statewide 100 person cap or 25% cap on worship services. And then what happened in the summer, there was a massive surge. And so the state had to loosen the restrictions. So not only do our experts testify that this shutting down indoor worship in tier one or in regional stay at home counties is necessary, but the history, the evolution of the state's orders also demonstrates that when the state permitted worship services indoors, even under 100% or 25% cap, there was a massive surge and loosen some other restrictions, there was a massive surge. With respect to that particular point, may I ask, is there anything in the record which traces the surge to the Harvest Rock Church or to any other church? There in the record are instances of outbreaks in churches in California that took place over the summer through the fall. Dr. Watt and Dr. Rutherford confirmed this. Dr. Rutherford, paragraph 77 through 79. Dr. Watt, paragraph 54 through 82, confirmed that when the restrictions were loosened, including the restrictions on worship services, there was an increase in COVID infections, hospitalizations and deaths. With respect to people who are at worship services, is that your argument? Including the loosening of restrictions on worship services. Well, including or with specific reference to? I think it makes a difference here. Your Honor, the state has presented evidence of instances of outbreaks traced to worship services beginning in May. Okay, thank you. Counsel, we've let you go over time. Our questions have been very vigorous and you've been very cooperative in responding to them. We've allowed you to go almost five minutes over time. So we have to give comparable time to Harvest Church. So, Counsel, you may proceed with your rebuttal. Thank you, Your Honor. With respect to the churches that we represent, there is no evidence of outbreak and there's no knowledge of outbreak in any of them. And that's certainly the relevant issue. If you go back before Tier 1, before the blueprint, Tier 1, although it wasn't called Tier 1, actually began on July the 13th. That was a no worship ban. That's what instituted this lawsuit. No worship ban across the state in many of the counties. And then the tier system was picked up in August with the blueprint and Tier 1 became the July 13 no worship. And then it extended it. In the briefing from the state, they said that they began to loosen restrictions through the summer. And certainly they did. But they continued the restrictions on places of worship from July 13. They continued them through August 28 in the blueprint. And as page one of our IPA brief says that we are challenging anything which includes the regional stay-at-home that bans this worship. In fact, in that regional stay-at-home order of December the 3rd, in paragraph D, critical infrastructure sectors are exempted. Those are the ones in Tier 1. And from July 13 to the present, they've always been exempted. And even now, December 3, exempts them. And here's 28 pages of critical infrastructure. And it goes through countless different kinds of activities, which I have mentioned in the Supreme Court, the Ninth Circuit, and the Second Circuit as they take them off. Those are still critical infrastructure that goes back to July 13, goes back and is incorporated in August 28 blueprint, is now exempted from this stay-at-home order. What counsel is referring to when he says, well, some of the things like personal services like care, those weren't in some of those Tier 1s. Those were in later tiers. So that doesn't affect the essential argument that this is the most restrictive provision in the entire nation of no worship, no matter whether your church is 150 or 1,500 or 5,000. And there's been no expert testimony to that effect about why they need to put a complete ban on all worship, no matter what they do. They just don't trust people to gather together and worship. But they trust the same people to go to the factories, to the big box centers, to the grocery stores and put your hands on the same items and the same handles that everybody else puts their hands on, which is frankly more risky than doing social distancing, cleansing, sanitizing, and temperature checks like our churches do. They do all of that and much more. They just simply don't even give the opportunity for that. And that is not narrow tailoring. And even through this argument, the state has still not argued narrow tailoring. They talk about their experts, but frankly, the Supreme Court and Catholic diocese rejected the experts because they had the same general presentation that places of worship are more risky. Generalized statements. The same thing in the Second Circuit. The same thing. Council, right there. When you say the same presentation, it seems to me there's a different presentation in this way. I read the state's experts to say that masking, when you say they don't give the opportunity, I read them to say that they're assuming that people are masking and are staying six feet apart. And that helps, but it's not enough. And that the reason, this is my paraphrase, but that the reason it's not enough in this particular instance is because of the proximity, people staying close within service and the duration of time. And because that, and this is what I'd like your feedback on, because it is a different type of gathering. It's a social gathering. And I believe it's Dr. Watt that explains people go to a religious service for the purpose of being together. Quite different than going to a grocery store or shopping center. Could you talk to that, please? Sure. Many of the churches actually have one way in, one way out. No congregating in lobbies. Other kinds of six foot distancing, masking, temperature checks, telling people to stay at home if they have any symptoms or if they're at a certain high risk category. They do that and much more. This is a family and they don't want to hurt them, let alone hurt the community as well. So they're going to take whatever extraordinary precautions are necessary to protect them, but they're not even given the opportunity. And yet when you, you look at say page 22 of the state's original opposition briefs to the IPA, it goes down to ability to do this or that. Face coverings, physical distancing, limited number of people, duration of exposure, amount of mixing of people, limited amount of physical interactions, optimized ventilation, and limited activities that are known to cause increased spread. But they don't even give places of worship the opportunity to do that. And places of worship I submit can do that and they have been doing it. And that's why if there was any evidence that the state could present that there was an outbreak in any one of our many, many churches throughout California, you can guarantee the state would present that evidence. And there is none. Thank you, counsel. Your time has expired. Unless there are some further questions. I just wanted to ask, because I asked the state winter factor, I'd like to ask Mr. Staver to address the public interest and the balance of equities prongs of the winter test. And let me begin your honor, if I can, with irreparable harm as well, because 13 days. Well, irreparable harm is not a concern to me. Interest in the balance of equities. I still have some question in my mind regarding those. Well, anything with regards to the public interest in the First Amendment, whether it's free speech or free exercise of religion, weighs heavily in favor of the public interest to protect that constitutional right. But the state has a very high public interest as well to protect church goers as well as non-church goers from this disease. I understand your honor. But the fact is, is that they haven't narrowly tailored that. Well, narrow tailoring is a different issue that goes to the likelihood of success on the merits in my view. So I'm just looking strictly at how do the public interest, how does the public interest factor stack up on each side of the equation? Well, certainly there's public interest by the state. They want to protect, no doubt, the health and welfare of people. And nobody's contending otherwise. But on the other hand, when you look at the fact that they banned worship, no matter the size of the sanctuary, and no matter what churches can do and are willing to do, and that there are no evidences of outbreaks in any of our churches, the public interest weighs against them and in favor of the churches, your honor. I would also mention, if I could, if this court does want, I don't think there's additional briefing necessary on the stay-at-home order. But if the court does want that, because the essential thing is the same, we certainly are willing to turn around in 24 hours or less a supplemental brief to this court if that's what this court desires. We're certainly willing to do that. But again, the stay-at-home order carries on the essential. All right. Thank you, counsel. Thank you. Your time has more than expired. Thank you both for being very, very helpful to us in sorting out this rather complex constitutional matter. Thank you very much. The case just argued will be submitted for decision, and the court is adjourned. Thank you. This court for this session stands adjourned.
judges: O'scannlain, Rawlinson, Christen